**MUTUAL OF OMAHA BANK, Plaintiff,**

v.

**Craig L. HUNTINGTON, Bank of Nevada, Western Alliance Bancorporation, Torrey Pines Bank, Kathy Beaulne, and Denise Sauro, Defendants.**

**And All Related Actions.**

No. 2:08–CV–01274–PMP–LRL.

United States District Court, D. Nevada.

Feb. 19, 2009.

Conrad S. Kee, Denver, CO, Paul T. Trimmer, Gary C. Moss, Jackson Lewis LLP, Las Vegas, NV, for Plaintiff.

Andrew P. Gordon, Jeffrey A. Silvestri, McDonald Carano Wilson, Las Vegas, NV, Kenneth D. Klein, Laura M. Wilson, Robin J. Samuel, Hogan & Hartson LLP, Los Angeles, CA, for Defendants.

## *ORDER*

PHILIP M. PRO, District Judge.

Presently before the Court is Defendants' Motion to Dismiss Counts One and Three of Plaintiff's First Amended Complaint (Doc. # 64), filed on December 10, 2008. Plaintiff filed an Opposition (Doc. # 78) on December 29, 2008. Defendants filed a Reply (Doc. # 89) on January 12, 2009. The Court held a hearing on these matters on February 17, 2009.

## I. BACKGROUND

### A. Factual and Procedural Background

According to the First Amended Complaint ("FAC"), on approximately December 27, 1999, First National Bank of Nevada ("FNBN") employed Defendant Craig Huntington ("Huntington") as "Vice President, HOA Division Manager," with responsibility for providing banking services to homeowner/community associations. (First Am. Compl. (Doc. # 44) ["FAC"] ¶ 21.) Between 1999 and 2008, while growing its homeowner/community association business, FNBN established the Community Association Banc ("CAB") that provided banking services to such associations. (*Id.* ¶ 25.)

Huntington and FNBN entered into a January 1, 2005 employment agreement and a July 1, 2006 amendment that extended the employment agreement until December 2011. (*Id.* ¶ 28, 30.) Huntington agreed that "for a period of one (1) year following the date [he] separates from employment with [FNBN] for any reason whatsoever, he will not compete, directly or indirectly, with" FNBN in its market areas. (*Id.* ¶ 30(b), Ex. 1.) Huntington also agreed that for one year following his separation with FNBN he would "not solicit business, nor accept solicited or unsolicited business" from any FNBN customer with whom he had personally dealt. (*Id.* ¶ 30(d), Ex. 1.) Huntington further agreed not to reveal FNBN's proprietary information or trade secrets. (*Id.* ¶ 28.)

FNBN also employed Defendants Denise Sauro ("Sauro") and Kathy Beaulne ("Beaulne") in CAB. (*Id.* ¶¶ 5–6.) FNBN employed Sauro in 2001 and promoted her to Vice President/Regional Account Manager for CAB on August 15, 2007. (*Id.* ¶ 23.) FNBN employed Beaulne as Business Development Officer for CAB on March 8, 2004. (*Id.* ¶ 24.) Both Sauro and Beaulne entered into employment agreements with FNBN similar to that of Huntington in which they agreed to noncompete and trade secret provisions. (*Id.* ¶¶ 33–34, 62–63.)

On July 25, 2008, the Office of the Comptroller of Currency closed FNBN and First Heritage Bank, N.A. ("FHB"), designating the Federal Deposit Insurance Corporation ("FDIC") as their Receiver. (*Id.* ¶ 10.) That same day, FDIC entered into purchase and assumption agreements with Plaintiff Mutual of Omaha Bank ("Mutual of Omaha"), whereby Mutual of Omaha purchased certain assets, including all CAB assets, and assumed responsibility for all FNBN and FHB deposits. (*Id.* ¶¶ 11, 20.) Mutual of Omaha also entered into a confidentiality agreement with FDIC, as did Defendant Western Alliance Bancorporation ("Western Alliance"), allowing Western Alliance to receive CAB information. (*Id.* ¶¶ 13–14, 19.)

On approximately August 11, 2008, Huntington, Sauro, and Beaulne became Mutual of Omaha employees. (*Id.* ¶¶ 35–36, 40.) FDIC transferred its rights to Huntington's employment agreement on September 10, 2008, and to Sauro's and Beaulne's agreements on September 22, 2008. (*Id.* ¶¶ 38–39.) Huntington's employment at Mutual of Omaha included similar responsibilities to those at FNBN and the same compensation. (*Id.* ¶¶ 41–42.) Between August 11 and September 14, 2008, Huntington attempted to renegotiate the employment agreement with Mutual of Omaha. (*Id.* ¶¶ 43–46.) On September 15, 2008, Huntington resigned from Mutual of Omaha, effective September 29, 2008. (*Id.* ¶ 48.) Huntington informed Mutual of Omaha he was planning to establish a business to compete with CAB at his new employer, Western Alliance or one of its affiliates, Defendants Bank of Nevada and Torrey Pines Bank ("Torrey Pines"). (*Id.* ¶¶ 4, 50.) Sauro and Beaulne also resigned from Mutual of Omaha, effective October 10, 2008, and accepted employment offers from Western Alliance or its affiliates. (*Id.* ¶ 60.)

On September 23, 2008, Mutual of Omaha filed the Complaint against Huntington, Western Alliance, and Bank of Nevada. (Compl.(Doc. #1).) Mutual of Omaha filed the FAC on November 17, 2008, adding Sauro, Beaulne, and Torrey Pines as Defendants. (FAC.) Mutual of Omaha brings eight causes of action: breach of contract against Huntington, Sauro, and Beaulne (count 1); breach of fiduciary duty against Huntington (count 2); tortious interference with contract and/or business expectancies against all Defendants (count 3); violation of the Nevada Uniform Trade Secrets Act against all Defendants (count 4); breach of contract against Western Alliance, Torrey Pines, and Bank of Nevada (count 5); tortious interference with business expectancy against all Defendants (count 6); civil conspiracy against Huntington, Western Alliance, Torrey Pines, and Bank of Nevada (count 7); and concert of action against Huntington, Western Alliance, Torrey Pines, and Bank of Nevada (count 8). (*Id.* at 13–18.) Defendants now move to dismiss counts one and three, arguing the employment agreements with Huntington, Sauro, and Beaulne are not in compliance with the requirements set forth for employment contracts in 12 C.F.R. § 563.39 and thus are unenforceable.

### B. Statutory and Regulatory Background

The United States Department of the Treasury regulates the banking industry, in part, through two administrative agencies: the Office of Thrift Supervision ("OTS") and the Office of the Comptroller of Currency ("OCC"). The OTS regulates and charters federal savings associations, also known as thrifts, pursuant to the Home Owners' Loan Act of 1933. *Silvas v. E*Trade Mortgage Corp.*, 514 F.3d 1001, 1004–05 (9th Cir.2008). On the other hand, the OCC regulates and charters na-

tional banks pursuant to the National Bank Act *Watters v. Wachovia Bank, N.A.,* 550 U.S. 1, 127 S.Ct. 1559, 1564, 167 L.Ed.2d 389 (2007).

The FDIC, an independent federal agency, insures the deposits of banks, through the Bank Insurance Fund, and savings associations, through the Savings Association Insurance Fund. 12 U.S.C. § 1811(a); *Great W. Bank v. OTS,* 916 F.2d 1421, 1423 n. 1 (9th Cir.1990). In the event a FDIC-insured bank or saving association fails, the FDIC may be appointed receiver of the failed institution. 12 U.S.C. § 1821(c)(5). The FDIC then may "transfer any asset or liability of the institution in default." *Id.* § 1821(d)(2)(G)(i). However, a transfer to another depository institution may be made only with the approval of the agency regulating that institution. *Id.* § 1821(d)(2)(G)(ii).

Here, the parties do not dispute that Mutual of Omaha is a federal savings association and the banks it took over, FNBN and FHB, are national banks. The FAC alleges OCC closed FNBN and FHB, designating FDIC as receiver. OTS therefore had to and apparently did approve the transfer of FNBN and FHB assets to Mutual of Omaha pursuant to OTS regulation 12 C.F.R. § 563.22. (*See* Mutual of Omaha's Opp'n to Defs.' Mot. to Dismiss (Doc. # 78), Ex. 1.)

## II. LEGAL STANDARD

When ruling on a motion to dismiss, the Court "must construe the complaint in the light most favorable to the plaintiff and must accept all well-pleaded factual allegations as true." *Siaperas v. Mont. State Comp. Ins. Fund,* 480 F.3d 1001, 1003 (9th Cir.2007) (quotation omitted). Although a plaintiff's factual allegations need not be detailed, a plaintiff must allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,*

550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007). Dismissal is proper only if no cognizable legal theory exists or the plaintiff has alleged insufficient facts to support a cognizable legal theory. *Siaperas,* 480 F.3d at 1003. " 'The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.' " *Hydrick v. Hunter,* 500 F.3d 978, 985 (9th Cir.2007) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

## III. DISCUSSION

Under OTS regulation 12 C.F.R. § 563.39, "[a] savings association may enter into an employment contract with its officers and other employees only in accordance with the requirements of this section." 12 C.F.R. § 563.39(a). Section 563.39 requires that "[a]ll employment contracts shall be in writing and shall be approved specifically by an association's board of directors." *Id.* Each employment contract also must contain certain "[r]equired provisions" that "shall provide" that: (1) the board of directors may terminate an employee's employment at any time and if the termination is for cause, the employee has no right to receive compensation; (2) if an employee is suspended from participating in the association's affairs, the savings association's contractual obligations are suspended unless stayed; (3) if the employee is removed from participating in the savings association's affairs, all contractual obligations, other than vested rights, shall terminate; (4) if the savings association is in default, all contractual obligations, other than vested rights, shall terminate; (5) all contractual obligations, other than vested rights, shall be terminated, except if continuation of the contract is necessary for the savings association's continued operation, when (i) the FDIC enters an agreement to assist the

savings association or (ii) a merger is approved to resolve problems or the savings association is in unsafe or unsound condition. *Id.* § 563.39(b).

The parties do not dispute that the employment agreements were valid as entered into by FNBN because, as a national bank, FNBN's employment contracts were not required to comply with § 563.39. However, they dispute whether § 563.39 applies to the employment agreements after assumption by Mutual of Omaha and, if so, whether the employment contracts meet § 563.39's requirements. Defendants contend savings associations must comply with § 563.39 when entering into or assuming employment contracts. Mutual of Omaha responds that § 563.39 is not applicable because the employment agreements are not "employment contracts" and Mutual of Omaha did not "enter into" them. Mutual of Omaha further argues that the history of § 563.39 and the 1994 amendments thereto show § 563.39 never was intended to apply when an employment agreement is assumed via a bulk transfer.

### A. "Employment Contracts"

Defendants argue the employment agreements are "employment contracts." Mutual of Omaha responds that the agreements are at-will compensation arrangements governed by 12 C.F.R. § 563.161, not § 563.39. Defendants reply that § 563.161 sets forth compensation guidelines and does not suggest a compensation arrangement is an alternative to an "employment contract." Defendants argue the employment agreements fall under "employment contract" as defined by the OTS *Examination Handbook.* Finally, Defendants contend Mutual of Omaha admitted the agreements are contracts by bringing claims for breach of the agreements and arguing they are contractual assets.

The OTS regulations do not define "employment contract." *Modzelewski v. Resolution Trust Corp.,* 14 F.3d 1374, 1376 (9th Cir.1994). However, the United States Court of Appeals for the Ninth Circuit determined an agreement is an "employment contract" if it sets forth the " 'terms and conditions' of employment." *Id.* (quoting *Black's Law Dictionary* 525 (6th ed. 1990)). Similarly, the OTS *Examination Handbook* defines "employment contract" as "any agreement, intended to be legally enforceable, that materially affects the terms and conditions of a person's employment." *Examination Handbook* § 310.14 (2009), *available at* http://files.ots.treas.gov/422321.pdf.

Section 563.161 discusses management and financial policies for savings associations. It states that savings associations must be "well managed and operate safely and soundly" and "must pursue financial policies that are safe and consistent with economical home financing." 12 C.F.R. § 563.161(a). Section 563.161 also states that "[c]ompensation to officers, directors, and employees of each savings association and its service corporations shall not be in excess of that which is reasonable and commensurate with their duties and responsibilities." *Id.* § 563.161(b). The *Examination Handbook* provides guidance for reviewing employment contracts and "compensation arrangements" by listing factors for determining compensation and giving examples of unsafe or unsound compensation provisions. *Examination Handbook* §§ 310.15–17.

■ The *Examination Handbook* provides guidance for both employment contracts and compensation arrangements. An "employment contract" still must comply with § 563.161, in that employee compensation must be "reasonable and commensurate with [the employee's] duties and responsibilities." In other words, not

all compensation arrangements are employment contracts, but an employment contract discussing compensation must adhere to the regulatory standards for providing compensation.

█ The employment agreements at issue in the present case provide "terms and conditions" of employment. For example, Huntington's agreement includes the period the agreement covers, position title, reporting structure, salary, a covenant not to compete, and severance pay. (FAC, Ex. 1.) Beaulne's agreement has similar provisions and states that it "will outline the terms of [the] employment offer." (FAC, Ex. 2.) Sauro's agreement provides similar terms but states the agreement provides a change to her "compensation structure." (FAC, Ex. 3.) While the exact terms mostly are redacted from the exhibits submitted to the Court, these agreements show the terms and conditions of Huntington's, Beaulne's, and Sauro's employment. Additionally, nothing indicates the contracting parties did not intend the agreements to be legally enforceable, and the provisions, such as incentive or commission structure, materially affect the conditions of their employment. Thus, the agreements are "employment contracts."

### B. "Enter Into" v. "Assumed" the Employment Agreements

█ The parties dispute whether a savings association "enter[s] into" an employment contract under § 563.39 when it assumes an employment contract. Mutual of Omaha also argues that if employment contracts transferred by FDIC from a bank to a savings association were invalidated for failure to comply with § 563.39, FDIC's ability to transfer assets would be hindered and employees covered by employment agreements could demand increased control and compensation from the acquiring savings association. Defendants contend Mutual of Omaha cannot claim it did not enter into the employment agreements as it is trying to enforce them with this lawsuit. Finally, Defendants argue Mutual of Omaha's concerns about a loss of FDIC power are inaccurate, as evidenced by the fact that FDIC has not intervened here and, even if Mutual of Omaha's concerns were valid, it would be up to Congress or OTS to repeal or amend the relevant provisions.

█ To interpret regulations, the Court looks first to the plain language. *United States v. Bucher,* 375 F.3d 929, 932 (9th Cir.2004). The Court presumes "the drafters said what they meant and meant what they said." *Id.* If the regulation is unambiguous, the plain meaning controls unless the reading would lead to absurd results. *Id.* However, if the regulation is ambiguous, "the agency's interpretation controls so long as it is reasonable, that is so long as the interpretation sensibly conforms to the purpose and wording of the regulations." *Miller v. Cal. Speedway Corp.,* 536 F.3d 1020, 1028 (9th Cir.2008) (quotations omitted).

Section 563.39 states a savings association may "enter into" employment contracts only in accordance with the section's requirements. 12 C.F.R. § 563.39(a). A common sense reading of "enter into" seems to cover only those parties that initiate an agreement. *See Webster's Third New International Dictionary* 756 (2002) (defining enter as "to make a beginning: take the first steps: engage, start"). However, *Black's* defines "enter" as "[t]o become a party to," *Black's Law Dictionary* 572 (8th ed. 2004), and *Webster's* defines "enter into" as "to make oneself a party to or in" and "become a part of," *Webster's Third* at 757. This implies "enter into" includes becoming a party by assuming a contract. Indeed, the United States Court of Appeals for the District of Columbia concluded an entity has "entered

into" a contract under 12 U.S.C. § 1821 "whenever an entity agrees to undertake obligations and gain rights in a contract." *Bank of N.Y. v. FDIC*, 508 F.3d 1, 5 (D.C.Cir.2007).

Although OTS has not interpreted the "enter into" language officially, pursuant to the OTS *Applications Handbook*, compliance with § 563.39 is one factor to consider when OTS evaluates applications from savings associations acquiring national banks. *Applications Handbook* § 240.14 (2001) *available at* http://files.ots. treas.gov/425015.pdf. In these situations, the acquiring savings association does not initiate the employment agreement, but OTS still considers whether the agreement complies with § 563.39. Thus, OTS apparently considers "enter into" broad enough to encompass assumptions. Considering both the plain language and OTS policy, Mutual of Omaha "enter[ed] into" the employment agreements upon assumption of those agreements.

### C. History of § 563.39

Mutual of Omaha argues § 563.39's history suggests it does not apply to contracts a savings associations obtained from FDIC as receiver. Mutual of Omaha notes that a prior applicable regulation, 12 C.F.R. § 545.25–1, limited the duration of employment contracts assumed via a bulk purchase. However, Mutual of Omaha contends that, in 1982, § 545.25–1 was subsumed into § 563.39, and the reference to bulk transfers was deleted. Mutual of Omaha thus contends § 563.39 does not apply to employment contracts assumed via bulk transfers.

After enactment in 1974, § 545.25–1 provided limitations on the length of employment contracts, including those obtained through a transfer where the employee "immediately prior to such transaction, was an officer of the association being acquired and who, after such transaction,

will be an officer of the resulting association." 12 C.F.R. § 545.25–1(b) (1975) (repealed); Officers' Employment Contracts, 39 Fed.Reg. 28,609, 28,610 (Aug. 9, 1974). At the time, § 563.39 did not apply to savings associations and stated employment agreements by other institutions were not necessarily unsound because they did not comply with § 545.25–1. 12 C.F.R. § 563.39 (1975).

As of 1982, the Federal Home Loan Bank Board ("Bank Board") found the ability of struggling institutions (other than federal associations) to make long-term employment contracts limited the Bank Board's flexibility to resolve the institutions' difficulties. Final Rule, 47 Fed.Reg. 17,471, 17,471 (Apr. 23, 1982). The Bank Board concluded safe and sound financial policies require employment contracts of all insured institutions to be subject to termination. *Id.* Thus, it incorporated the mandatory requirements of § 545.25–1 into § 563.39 "in order to remedy abusive practices and in order to provide the same treatment for both federal associations and other insured institutions." *Id.* Although the amended § 563.39 did not incorporate § 545.25–1's specific term limitations, it did provide that if an employment contract limits the institution's ability to terminate employment, such as "where an employment contract provides for an excessive term," it may be an unsound practice. *Id.* at 17,-472; 12 C.F.R. § 563.39(a) (1983).

The deletion of the reference to transfers of employment contracts does not necessarily mean § 563.39 does not apply to assumed employment contracts. Because a main purpose behind the 1982 change was to give the Bank Board "greater flexibility to terminate employment contracts," specific time limitations became unnecessary. *See* Final Rule, 47 Fed.Reg. at 17,-471. The broad statement against excessive terms could apply to all employment

agreements, including those that were transferred. Further, the federal oversight of savings associations has changed greatly since 1982. For example, in 1989, the Bank Board was abolished and its responsibilities were split between FDIC and the newly-enacted OTS. *Great W. Bank,* 916 F.2d at 1423 n. 1. Thus, changes during a different regulatory environment do not establish whether § 563.39 applies to the agreements here.

### D. 1994 Regulatory Amendments

■ OTS regulation 12 C.F.R. § 563.22 provides criteria by which OTS evaluates a savings association's acquisition of an insured depository institution's assets. Mutual of Omaha argues that after 1994 regulatory amendments, § 563.22 no longer required employment contracts assumed pursuant to a bulk transfer of assets to comply with § 563.39. Defendants reply that the regulatory history indicates OTS intended to streamline the regulations, not to make substantive alterations, and never suggested eliminating the requirements of § 563.39 in connection with bulk transfers.

Prior to the 1994 amendments, § 563.22 required OTS to "apply the criteria set out in § 571.5" when "determining whether to confer approval for a transaction." 12 C.F.R. § 563.22(c)(1) (1994). Section 571.5 required OTS to review a transfer proposal based on listed criteria, including that "[a]ny employment contracts should conform with § 563.39." 12 C.F.R. § 571.5(d)(4) (1994) (repealed). The 1994 version of § 563.39, like the current version, required a savings association to enter employment agreements only in accordance with the section's requirements. 12 C.F.R. § 563.39(a) (1994).

In 1994, OTS amended its regulations to implement sections 501 and 502 of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA"). Mergers, Transfers of Assets and Liabili-

ties ("Mergers"), 59 Fed.Reg. 44,615, 44,-615 (Aug. 30, 1994). Prior to FDICIA's enactment, a five-year moratorium from 1989 to 1994 prohibited conversion transactions, including Bank Insurance Fund–to–Savings Association Insurance Fund conversions and deposit transfers. Proposed Rule, 57 Fed.Reg. 37,112, 37,113 & n. 5 (Aug. 18, 1992). However, the FDICIA amendments eased "previous restrictions on conversion transactions to permit all insured depository institutions to merge, assume each other's deposits, and transfer assets to each other in exchange for assuming deposit liabilities." *Id.* at 37,112–13; *see also* FDICIA § 502, 12 U.S.C. § 1467a(s)(1) ("[A]ny Federal savings association may acquire or be acquired by any insured depository institution.").

To implement OTS's expanded authority, OTS amended its regulations to "authorize Federally-chartered savings associations to acquire and be acquired by other depository institutions insured by the" FDIC. Mergers, 59 Fed.Reg. at 44,615, 44,621. The new regulations also made "technical and conforming changes ... to simplify and clarify the application and notice procedures applicable to all mergers and other combinations involving savings associations." *Id.* at 44,621. Specifically, OTS revised § 563.22 "to incorporate streamlined and consolidated review standards derived from § 571.5, and § 571.5[was] deleted." *Id.* at 44,617. OTS noted the detailed criteria of § 571.5 were unnecessary and, instead, "general standards" were preferable to evaluate the safety and soundness of a particular transaction. *Id.*

In addition to streamlining the regulations, OTS implemented sections 501 and 502 of FDICIA. Before the 1994 amendments, a savings association could acquire the assets only of other savings associations. Under these circumstances, it

makes sense that both the acquired and acquiring savings association must comply with OTS's requirements as OTS would be the regulatory authority over both the acquiring and the acquired association. The same logic does not apply when a savings association acquires a national bank because the bank was never bound by OTS regulations. In effect, the omitted reference to § 56339 supports the inference that OTS omitted details that would apply only to savings association-to-savings associations transactions because in 1991 Congress permitted a broader range of transactions, thereby necessitating more "general standards."

OTS's *Applications Handbook* discusses applications for savings associations to acquire assets and liabilities from insured depository institutions, including national banks, and specifies factors OTS "should consider" when reviewing applications. *Applications Handbook* § 240.13. For example, OTS should consider whether the applicant submitted copies of proposed employment contracts and ask whether the proposed agreements "comply with the requirements of 12 C.F.R. § 563.39." *Id.* §§ 240.13–14. Thus, it appears OTS still considers § 563.39 in national bank-to-savings association transfers.

The *Applications Handbook's* statement that OTS "should consider" § 563.39

among other factors in ensuring "the viability and safe and sound operation of the applicant savings institution," does not necessarily imply employment agreements "must" comply with § 563.39. *See id.* § 240.12. However, because OTS was required by 12 U.S.C. § 1821(d)(2)(G)(ii) to approve Mutual of Omaha's acquisition of FNBN assets and FDIC assigned the agreements, it would be illogical to conclude that OTS regulations require the Court to invalidate a contract OTS permitted to be transferred and FDIC assigned. Because the employment agreements were included in the transfer of assets and viewing the allegations of the existence of the employment agreements in the light most favorable to Mutual of Omaha, OTS would not have approved Mutual of Omaha's acquisition of the employment agreements if they were unenforceable under OTS regulations. At a minimum, it is premature at the motion to dismiss stage to determine whether OTS considered the validity of the employment agreements when approving Mutual of Omaha's acquisition of the CAB assets. The Court therefore denies Defendants' Motion to Dismiss.[1]

## IV. CONCLUSION

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss Counts One

1. Defendants also argue that even if the employment agreements are valid, Mutual of Omaha's claim for tortious interference with contract and/or business expectancies (count 3) should be dismissed because the CAB employees began work for Mutual of Omaha without a contract and therefore were at-will employees. *See Alam v. Reno Hilton*, 819 F.Supp. 905, 911 (D.Nev.1993) ("An at-will employee relationship is not a contract with which a third party can interfere."). The FAC alleges Defendants interfered with Sauro's, Beaulne's and other Mutual of Omaha employees' contracts. (FAC ¶ 75–76.) Even assuming Sauro and Beaulne were at-will when they first began working for Mutual of Oma-

ha, the FAC alleges their employment agreements were assigned to Mutual of Omaha before they resigned. (*Id.* ¶¶ 39, 60.) As for the other employees, the FAC alleges Defendants knew the employees would breach "contractual obligations" to Mutual of Omaha when Defendants attempted to induce them to resign. (*Id.* ¶¶ 75–76.) Viewing the allegations in the light most favorable to Mutual of Omaha, the FAC alleges that Sauro, Beaulne, and other employees were under a contractual obligation to Mutual of Omaha at the time Defendants allegedly interfered with their employment contracts. Defendants argument therefore fails.

and Three of Plaintiff's First Amended Complaint (Doc. # 64) is hereby DENIED.