**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

PHILIP DECOHEN, on his own behalf
and on behalf of all others
similarly situated,

*Plaintiff-Appellant,*

v.

CAPITAL ONE, N.A., successor by
merger to Chevy Chase Bank,
F.S.B.,

*Defendant-Appellee,*

and

No. 11-2161

ABBASI LLC, d/b/a Nation Auto of
Marlow Heights; BEACON
INDUSTRIES WORLDWIDE,
INCORPORATED,

*Defendants.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William D. Quarles, Jr., District Judge.
(1:10-cv-03157-WDQ)

Argued: October 25, 2012

Decided: December 26, 2012

Before SHEDD, DAVIS, and WYNN, Circuit Judges.

Vacated and remanded by published opinion. Judge Davis wrote the opinion, in which Judge Shedd and Judge Wynn joined.

---

**COUNSEL**

**ARGUED:** Benjamin Howard Carney, GORDON & WOLF, CHTD, Towson, Maryland, for Appellant. Bryan Alan Fratkin, MCGUIREWOODS, LLP, Richmond, Virginia, for Appellee. **ON BRIEF:** Martin E. Wolf, GORDON & WOLF, CHTD, Towson, Maryland; Mark H. Steinbach, O'TOOLE, ROTHWELL, NASSAU & STEINBACH, Washington, D.C., for Appellant. Ava E. Lias-Booker, Sung B. ("Ben") Yhim, MCGUIREWOODS, LLP, Baltimore, Maryland, for Appellee.

---

**OPINION**

DAVIS, Circuit Judge:

This appeal arises out of an allegation by Appellant Philip Decohen that he paid for something that he did not receive. The question presented is whether the Maryland law that protected his expectation is enforceable.

Decohen bought a used Chrysler Pacifica and financed it with a loan from a Maryland car dealer, Nation Auto of Marlow Heights ("Nation Auto"). The amount financed included a $600 charge for a "debt cancellation agreement." Under the Maryland Credit Grantor Closed End Provisions ("CLEC"), Md. Code Ann., Com. Law § 12-1001 *et seq.*, such an agreement requires a lender to cancel the remaining loan balance when a car is totaled and the insurance payout does not cover the entire outstanding balance. But that did not happen here. Decohen's car was totaled, but Nation Auto had assigned his

loan to Appellee Capital One, N.A. ("Capital One"), and Capital One argues that it does not have to cancel the remaining loan balance because the National Bank Act ("NBA") and federal regulations preempt Maryland's CLEC law. Decohen filed this putative class action, asserting claims for, *inter alia*, breach of contract and violation of the CLEC.

The district court was persuaded that the NBA and federal regulations preempt the CLEC, and that Decohen failed to state a claim for breach of contract; it therefore granted Capital One's motion to dismiss. For the reasons set forth below, we conclude that the district court erred. Accordingly, we vacate the judgment and remand for further proceedings consistent with this opinion.

I.

Decohen purchased a used Chrysler Pacifica from Nation Auto in Temple Hills, Maryland, on September 29, 2007, for $22,669, financing the purchase with a Retail Installment Sale Contract ("RIC"). The RIC lists Decohen as the "Buyer" and Nation Auto as the "Creditor – Seller." J.A. 42. The total price of the vehicle included a $600 charge for an "Optional Debt Cancellation Agreement." J.A. 43. The "Applicable Law" section of the contract stated:

> Federal law and Maryland law apply to this contract. This contract shall be subject to the Credit Grantor Closed End Credit Provisions (Subtitle 10) of Title 12 of the Commercial Law Article of the Maryland Code.

J.A. 45. The contract also contained a "Holder Notice" that stated:

> Any holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services

> obtained pursuant hereto or with the proceeds hereof. Recovery hereunder by the debtor shall not exceed amounts paid by the debtor hereunder.

*Id.* (emphasis removed).

Under Maryland's CLEC law, the only valid debt cancellation agreement that can be financed as part of the purchase of a vehicle is one that pays off the entire remaining loan balance in the event of a total loss. Md. Code Ann., Com. Law §§ 12-1001(h), 12-1005(c)(1). The law defines a "debt cancellation agreement" as "an agreement between a credit grantor and a borrower which provides for cancellation of the remaining loan balance in the event of theft or total destruction of the collateral for the loan minus the proceeds of any insurance maintained on the collateral for the loan. . . ." *Id.* § 12-1001(h).

The debt cancellation agreement that was part of Decohen's contract did not comply with Maryland law. The agreement stated that the "Dealer/Assignee agrees to cancel a *portion of* the Customer's indebtedness in the event of a Total Loss of the Vehicle." J.A. 47 (emphasis added). The agreement states that portion will be calculated as the "Unpaid Net Balance less the Actual Cash Value" of the vehicle. *Id.* The agreement goes on to define "Unpaid Net Balance" and "Actual Cash Value" such that the customer's remaining loan balance may not be entirely cancelled. The agreement defines the unpaid net balance as the purchase price of the vehicle (the "amount financed"), divided by the total number of payments, and then multiplied by the number of payments remaining after the loss of the vehicle. J.A. 48. This formula, however, omits interest payments. Decohen's "Amount Financed," according to his RIC, was the purchase price: $22,669. J.A. 42. His total number of payments was 72. Divide $22,669 by 72, and the resulting monthly payment is $314. Decohen's RIC, however, specified that the monthly payment on the loan would be $454, which includes interest with the principal.

A second provision of the debt cancellation agreement also was at odds with the CLEC. The agreement defines the "Actual Cash Value" of the vehicle as the amount paid by the insurance company, *or* the Kelley Blue Book retail value of the car, *or* the National Automobile Dealer Association's ("NADA") used car guide retail value — whichever is greater. J.A. 48. The CLEC, however, requires a debt cancellation agreement to cancel "the remaining loan balance" minus "the proceeds of any insurance maintained." Md. Code Ann., Com. Law § 12-1001(h). The law does not allow for the use of retail car guides in the calculation. *See id.*

Decohen suffered a total loss of the Pacifica in 2010. His insurance company paid a total of $12,839. But Decohen owed another $1,504 on the vehicle. Under Maryland law, as described above, the holder of the note on the vehicle would have been compelled to cancel the remaining balance. Consequently, Decohen submitted a claim to the servicer of the debt cancellation agreement, Beacon Industries Worldwide, of Fort Lauderdale, Florida. Beacon calculated the unpaid net balance to be $12,908.[1] Beacon then calculated the "actual cash value" of the car by looking to the NADA used car guide, which set the car's value at $13,475. As the value was greater than the balance, Beacon denied the claim. As a result of the claim denial, Capital One demanded payment of the $1,504 remaining loan balance.

On September 29, 2010, Decohen filed suit in the Circuit Court for Baltimore City against Capital One, Beacon Industries, and Abbasi LLC (Nation Auto is a registered trade name of Abbasi LLC, and Nation Auto apparently has gone out of business). The lawsuit alleged violations of the CLEC, the Maryland Consumer Protection Act ("MCPA"), and the Maryland Retail Installment Sales Act ("RISA"), as well as

---

[1]This figure represents the amount financed, $22,669, divided by the total number of payments, 72, for a monthly payment of $314, multiplied by the remaining number of payments, 41, for a total of $12,908.

claims for breach of contract, declaratory relief, and restitution and unjust enrichment. Defendants removed the case to the United States District Court for the District of Maryland under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1453, and 28 U.S.C. § 1332(d)(2).[2]

The district court dismissed all claims against Capital One and Beacon. *Decohen v. Abbassi, LLC*, No. WDQ-10-3157, 2011 WL 3438625, at *7 (D. Md. July 26, 2011). Because Decohen appeals only the dismissal of the CLEC and breach of contract claims against Capital One, we limit our review to those claims. First, the court found that the debt cancellation, or Guaranteed Asset Protection ("GAP"), agreement attached to Decohen's financing contract was not permissible under Maryland law. Specifically, the court stated: "Decohen's complaint is sufficient to show that the GAP Agreement is not a 'debt cancellation agreement' within the meaning of the CLEC, and therefore may not be financed 'in connection with closed end credit offered and extended' under the statute." *Id.* at *4 (quoting Md. Code Ann., Com. Law § 12-1002(b)). Thus, the court reasoned, "the CLEC claim will not be dismissed on the basis that Decohen's allegations fail to state a basis for relief under Maryland law." *Id.*

The district court, however, found the CLEC claim was preempted by the NBA. *Id.* at *6. The court first noted that national banks are controlled by the NBA and regulations promulgated thereunder by the Office of the Comptroller of the Currency ("OCC"). *Id.* at *5. Under OCC regulations, national banks have authority "'to enter into debt cancellation contracts . . . in connection with extensions of credit.'" *Id.* at

---

[2]Section 1332(d)(2) creates federal jurisdiction over any class action in which the amount in controversy exceeds $5 million. The removal notice in the instant case states that the amount in controversy is approximately $5.5 million and that Capital One has identified at least 1,145 retail installment sales contracts with a debt cancellation agreement. *See Decohen v. Abbasi, LLC*, No. WDQ-10-3157, 2011 WL 3438625, at *2 (D. Md. July 26, 2011).

*6 (quoting 12 C.F.R. § 37.1(a)). The court then noted that under the NBA, a debt cancellation contract is defined as a "'loan term of contractual arrangement . . . under which a bank agrees to cancel all or part of a customer's obligations to repay an extension of credit from that bank upon the occurrence of specified events.'" *Id.* (quoting 12 C.F.R. § 37.2(f)). Thus, the court concluded, the GAP agreement in the instant case was a "debt cancellation contract" for NBA purposes. *Id.* Because such contracts are governed by federal law and regulations, the court held, state regulation of such contracts is preempted. *Id.*

Finally, the district court reasoned that the fact that Capital One did not originate the loan, but rather was assigned it, does not change the preemption analysis. *Id.* To support this legal conclusion, the court cited *Aguayo v. U.S. Bank*, 658 F. Supp. 2d 1226, 1235-36 (S.D. Cal. 2009), which held that because loans purchased by national banks are "subject to the same regulation" as loans originated by the bank, "it follows that assigned [retail installment contracts] are subject to the same preemption [analysis] as direct loans." However, since the district court adopted that view in the instant case, the Ninth Circuit has reversed *Aguayo*, *see Aguayo v. U.S. Bank*, 653 F.3d 912, 919 (9th Cir. 2011), finding that state laws relating to "contracts" and "rights to collect debts" are not preempted by the NBA because they are covered by an OCC savings clause, 12 C.F.R. § 7.4008(e)(1).[3]

The district court also found that Decohen failed to state a claim for breach of contract, *Decohen*, 2011 WL 3438625, at *5, reasoning that "nothing in the complaint, Credit Contract, or GAP Agreement shows that Capital One agreed, or was otherwise required, to cancel Decohen's remaining loan bal-

---

[3]We recently stated that we "find persuasive" the Ninth Circuit holding in *Aguayo, Epps v. JP Morgan Chase Bank*, 675 F.3d 315, 319 n.3 (4th Cir. 2012), but of course the district court in the case at bar did not have the benefit of our approval.

ance." *Id.* The court further stated that "no provision in the CLEC mandates that creditors cancel a remaining loan balance in the event of a total loss." *Id.* The court thus dismissed the breach of contract claim.

Decohen noted a timely appeal of the district court's judgment. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review de novo the question of whether a state law is preempted by federal law. *AES Sparrows Point LNG, LLC v. Smith*, 527 F.3d 120, 125 (4th Cir. 2008). We also review de novo the grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Decohen argues that the district court erred in finding that federal law preempts the CLEC and in dismissing his breach of contract claim. We first consider Decohen's CLEC claim.

### A.

#### 1.

The Constitution's Supremacy Clause states that the Constitution and the laws made in pursuance thereof "shall be the supreme Law of the Land." U.S. Const. Art. VI, cl. 2. In *McCulloch v. Maryland*, 17 U.S. 316, 424 (1819), the Supreme Court held federal law supreme over state law with respect to national banking. In 1864 Congress enacted the National Bank Act and established the system of national banking still in place today. *See Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 10 (2007). The Act vested in nationally

chartered banks enumerated powers and "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24 (Seventh). To prevent inconsistent state regulation from impairing the national system, Congress provided: "No national bank shall be subject to any visitorial powers except as authorized by Federal law." 12 U.S.C. § 484(A).

The Supreme Court, in interpreting the NBA, has "repeatedly made clear that federal control shields national banking from unduly burdensome and duplicative state regulation." *Watters*, 550 U.S. at 11. Despite the broad scope of the NBA, however, national banks "are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA." *Id.* "States are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's or the national bank regulator's exercise of its powers." *Id.* at 12. But when state regulations significantly impair a national bank's authority under the NBA — its ability to engage in "the business of banking" — the state regulations must give way. *Id.* at 12, 21.

The doctrine of federal preemption, which regulates the interplay between federal and state laws when they conflict or appear to conflict, tilts in favor of the federal government in the arena of national banking. The "grants of both enumerated and incidental 'powers' to national banks" are "not normally limited by, but rather ordinarily pre-empt[ ], contrary state law." *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 32 (1996). Our precedent is clear that the presumption against preemption, which governs fields traditionally regulated by the states, does not apply to the NBA. *See Nat'l City Bank of Ind. v. Turnbaugh*, 463 F.3d 325, 330-31 (4th Cir. 2006) (holding the presumption against preemption does not apply to state regulation of federally chartered banks); *Epps*, 675 F.3d at 321-22 (same). We have specifically declined to apply the presumption to Maryland's CLEC

because the state law "regulates an area with authorized federal presence." *Epps*, 675 F.3d at 322.

Following the Supreme Court's lead, we have acknowledged three types of federal preemption: (1) express preemption, in which Congress expressly states its intent to preempt state law, *Cox v. Shalala*, 112 F.3d 151, 154 (4th Cir. 1997); (2) field preemption, in which Congress occupies a certain field by "regulating so pervasively that there is no room left for the states to supplement federal law," *id.* (citing *Fid. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982)); and (3) conflict preemption, arising when state law is preempted "to the extent it actually conflicts with federal law," *id.* (citing *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983)). In the instant case, the district court found that the NBA and the relevant regulations both expressly preempt and field preempt state regulations of debt cancellation contracts. We disagree.

In examining both express and field preemption under the NBA, we must consider the guidance of the OCC and its regulations. Congress has authorized the OCC to promulgate regulations implementing the NBA. *See* 12 U.S.C. § 93a. Those regulations contain both an express preemption provision and a savings clause. The express preemption provision states:

> (1) Except where made applicable by Federal law, state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized non-real estate lending powers are not applicable to national banks.
>
> (2) A national bank may make non-real estate loans without regard to state law limitations concerning:
>
> . . .
>
> (iv) The terms of credit, including the schedule for repayment of principal and interest, amortization of

loans, balance, payments due, minimum payments, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan[.]

12 C.F.R. § 7.4008(d). Following the preemption provision is the savings clause:

State laws on the following subjects are not inconsistent with the non-real estate lending powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national banks' non-real estate lending powers:

(1) Contracts;

. . .

(4) Rights to collect debts;

(5) Acquisition and transfer of property[.]

12 C.F.R. § 7.4008(e) (the "savings clause").

The OCC has also promulgated regulations concerning debt cancellation contracts ("DCCs") entered into by national banks. The OCC regulations "appl[y] to debt cancellation contracts and debt suspension agreements entered into by national banks in connection with extensions of credit they make" and "are governed by . . . applicable Federal law and regulations, and not by . . . State Law." 12 C.F.R. § 37.1(c). The regulations define a debt cancellation agreement as one "under which a bank agrees to cancel all *or part of* a customer's obligation to repay an extension of credit from that bank upon the occurrence of a specified event." 12 C.F.R. § 37.2(f) (emphasis added). The regulations also state that national banks are "authorized to enter into debt cancellation contracts

and debt suspension agreements and charge a fee therefor . . . ." 12 C.F.R. § 37.1(a). Further, the OCC has stated that "national banks are authorized to enter into DCC's with respect to loans they purchase as well as loans they originate directly." OCC Interpretive Letter No. 1095, 2008 WL 3274062 (Feb. 27, 2008). Capital One relies heavily on the fact that the OCC has stated that retail installment contracts purchased by banks are treated the same as loans originated by banks for regulatory and reporting purposes. *Id.* Therefore, the OCC stated, the purchase of a RIC "constitutes an extension of credit on which a national bank may offer a DCC . . . ." *Id.*

2.

Having carefully considered the matter in light of the plain language and purpose of the above-described regulatory regime and our precedent, we conclude, first, that the CLEC provisions regarding debt cancellation agreements are not expressly preempted by federal law when the agreements are part of credit contracts originated by a local lender and assigned to a national bank. The OCC regulations explicitly concern debt cancellation agreements *entered into* by national banks. *See* 12 C.F.R. § 37.1(c) ("This part applies to debt cancellation contracts and debt suspension agreements entered into by national banks in connection with extensions of credit they make."). Undoubtedly, if Capital One had directly loaned Decohen the money to purchase his vehicle, and that loan included a debt cancellation agreement, it would be governed by federal regulations. That is not the case before us. Here, Capital One did not loan Decohen the money to purchase his vehicle; Nation Auto did, and then Nation Auto assigned the loan to Capital One. The RIC identifies Decohen as the "[b]uyer" and Nation Auto as the "[c]reditor." J.A. 42. Federal regulations of national banks do not encompass such a situation and thus do not expressly preempt the CLEC's regulation of debt cancellation agreements originated by local lenders and assigned to national banks.

We further conclude that Congress has not occupied the field with regard to debt cancellation agreements. The OCC regulations concern only debt cancellation agreements entered into by national banks. This leaves room for state regulation of debt cancellation agreements entered into by entities other than national banks (such as here, a car dealer) and of agreements assigned to national banks. Congress has not spoken on those two matters in the NBA, and the OCC's regulations are not so pervasive as to crowd out any possible state regulations. *See Epps*, 675 F.3d at 323 ("'[T]he OCC has explicitly avoided full field preemption in its rulemaking and has not been granted full field preemption by Congress.'" (quoting *Aguayo*, 653 F.3d at 921-22)).

Finally, we conclude that the CLEC is not conflict preempted by federal banking regulations. "Conflict preemption occurs either when it is physically impossible to comply with both the federal and the state laws or when the state law stands as an obstacle to the objective of the federal law." *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008). The CLEC requires a debt cancellation agreement to cancel all of the "remaining" debt, Md. Code Ann., Com. Law § 12-1001(h), while federal regulations require a debt cancellation agreement to cancel "all or part of" the remaining debt, 12 C.F.R. § 37.2(f). It is not physically impossible to comply with both laws. A bank that chooses to cancel all of a customer's remaining debt would be in compliance with both the CLEC and federal regulations. Moreover, the state law does not stand as an obstacle to the objective of the federal law. The purpose of the OCC regulation of debt cancellation agreements "is to ensure that national banks offer and implement such contracts and agreements consistent with safe and sound banking practices, and subject to appropriate consumer protections." 12 C.F.R. § 37.1(b). The CLEC does not inhibit that purpose; indeed, it furthers it.

Capital One's arguments for preemption are not persuasive. Its focus on OCC regulations of loans made or entered into by

national banks is misplaced. This case concerns a loan entered into by Nation Auto, a local car dealer, and assigned to Capital One. As Nation Auto is not a national bank, there is no question that a RIC signed by Nation Auto that contains a clause electing to be governed by the CLEC is in fact governed by the CLEC. Because Capital One did not "enter into" or "offer" any debt cancellation agreements to Decohen, the regulations dealing with such conduct are inapposite.

Capital One's list of cases in which courts have held debt cancellation agreements preempted by federal law are, without exception, instances in which national banks *entered into* the agreements at issue. *See* Appellee Br. 12-13 (citing *First Nat'l Bank of E. Ark. v. Taylor*, 907 F.2d 775, 776 (8th Cir. 1990) (national bank "offering debt cancellation contracts"); *Denton v. Dep't Stores Nat'l Bank*, No. C10-5830RBL, 2011 U.S. Dist. LEXIS 84024, at *1 (W.D. Wash. Aug. 1, 2011) (national bank "sold [plaintiff] and other Washington consumers a credit card payment protection service"); *Rose v. Bank of Am. Corp.*, No. CV 10-5067-VBF, 2010 U.S. Dist. LEXIS 143516, at *2 (C.D. Cal. Nov. 5, 2010) (national bank "offered" debt cancellation products to plaintiff); *Spinelli v. Capital One Bank*, 265 F.R.D. 598, 605 (M.D. Fla. 2009) ("national banks entering into Debt Agreements"); *Thomas v. Bank of Am. Corp.*, 711 S.E.2d 371, 374 (Ga. App. 2011) (national bank "created a debt cancellation product" that was "purchased" by the plaintiff)). These cases do not address the issue presented here: the assignment of a loan containing a debt cancellation agreement to a national bank by an entity that is not itself a national bank.

Capital One argues, in the alternative, that the assignment of the RIC does not affect the preemption analysis. We disagree. Indeed, the assignment makes all the difference here in that it takes the debt cancellation agreement out of the ambit of the NBA and OCC regulations. The OCC interpretive letters relied on by Capital One to show that assignment does not affect preemption concern debt cancellation agreements

entered into or issued by national banks while using an automobile dealer as an agent. *See* Appellee Br. 16-18 (citing OCC Interpretive Letter No. 1095, 2008 WL 3274062 (Feb. 27, 2008) (concerning an "automobile dealer sell[ing] a national bank's DCC, as the bank's agent"); OCC Interpretive Letter No. 1093, 2007 WL 5396020 (Oct. 29, 2007) (concerning banks offering debt cancellation contracts "through automobile dealers," in which the dealers "act as the Bank's nonexclusive agents")). Here, Nation Auto was not an agent of Capital One; it merely negotiated and consummated the loan to Decohen and then assigned the loan to Capital One. Furthermore, as we have noted, the principal cases relied on by Capital One to show that assignment is irrelevant to our analysis, *Aguayo v. U.S. Bank, Inc.*, 658 F. Supp. 2d 1226 (S.D. Cal. 2009), and *Epps v. JP Morgan Chase Bank*, No. WMN-10-1504, 2010 U.S. Dist. LEXIS 122782 (D. Md. Nov. 19, 2010), both have been reversed, *see Aguayo v. U.S. Bank, Inc.*, 653 F.3d 912 (9th Cir. 2011); *Epps v. JP Morgan Chase Bank*, 675 F.3d 315 (4th Cir. 2012).

Capital One argues that allowing state regulation of debt cancellation agreements acquired through assignment will burden its lending activities. *See* Appellee Br. 14-15. But, as the Supreme Court has stated, national banks "are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA." *Watters*, 550 U.S. at 11. The Court noted that national banks must follow state usury laws, that contracts made by national banks "are governed and construed by State laws," and national banks' "acquisition and transfer of property [are] based on State law." *Id.* (internal citations and quotation marks omitted) (insertion in original). We also observe that national banks follow the notice requirements of state laws, including Maryland's CLEC, *see Epps*, 675 F.3d at 318, 326, and California's Unfair Competition Law, *see Aguayo*, 653 F.3d at 915. Manifestly, the CLEC's debt cancellation provision will not burden Capital One any more than the state laws it presumably already complies with.

Indeed, the only foreseeable burden today's decision places on Capital One's lending activities is that it would, in Capital One's words, "require national banks to examine the definitions of debt cancellation agreements for all fifty states to determine whether the assignment of a RISC might subject the bank to liability." Appellee Br. 15. We have little sympathy over this lament. Examining state laws for usury limits, notice requirements, and contract provisions is exactly what national banks already do. They are certainly capable of determining the definitions of debt cancellation agreements in the states in which they wish to acquire through assignment loans that contain such agreements. Capital One makes no showing to the contrary.

Finally, the undiscriminating nature of the CLEC undermines a central purpose of the federal preemption doctrine. The Comptroller of the Currency has stated that federal preemption provisions "do[ ] not preempt undiscriminating laws of general applicability that form the legal infrastructure for conducting a banking or other business[,]" and listed as examples "state laws on contracts, rights to collect debts, acquisition and transfer of property, taxation, zoning, crimes, and torts." Statement of John D. Hawke, Jr., Comptroller of the Currency, Before the S. Comm. on Banking, Hous. & Urban Affairs, on Federal Preemption of State Laws, Washington, D.C., 23 OCC Q.J. 69 (Sept. 2004). We stated in *Epps* that the relevant inquiry "is whether the state law at issue is undiscriminating, that is, does it treat national banks differently from other lenders." 675 F.3d at 315 (internal quotation marks omitted). We concluded that the CLEC "applies to any lender in Maryland and does not treat national banks differently from any other creditor." *Id.* The CLEC provision at issue here regulates "an agreement between a credit grantor and a borrower." Md. Code Ann., Com. Law § 12-1001(h). "Credit grantor" is broadly defined to include "any individual, corporation, business trust, statutory trust, estate, trust, partnership, association, two or more persons having a joint or common interest, or any other legal or commercial entity making a loan

or other extension of credit," and also includes "[a]ny bank, trust company, depository institution, or savings bank having a branch in [Maryland]." Md. Code Ann., Com. Law § 12–1001(g). The law is undiscriminating in its application: it does not treat national banks differently from other lenders.

For the foregoing reasons, we hold that the district court erred in deeming Decohen's CLEC claim against Capital One preempted by federal law and regulations. Having found that Capital One is subject to the terms of the CLEC in loans it acquires through assignment, we now turn to whether Capital One breached the RIC by failing to honor the terms of the CLEC.

## B.

Decohen challenges the district court's legal conclusion that he failed to state a claim for breach of contract. Under Maryland law, a complaint alleging a breach of contract "must of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant." *RRC Northeast, LLC v. BAA Maryland, Inc.*, 994 A.2d 430, 440 (Md. 2010) (citation and internal quotation marks omitted). The facts alleged by Decohen show both that Capital One owed him an obligation under the contract and that such obligation was breached when Capital One did not abide by the terms of the CLEC. Simply stated, Nation Auto's assignment of the contract to Capital One did not cleanse the agreement of its state law terms such that Capital One could ignore the CLEC entirely.

We are again guided in our analysis by our opinion in *Epps*, 675 F.3d at 326-28, where we held that a Maryland car dealer's assignment to a national bank of a RIC that the parties voluntarily elected to be governed by the CLEC bound the national bank to the terms of the CLEC. We stated in *Epps*, "This Court and the Supreme Court have recognized that

when a party to a contract voluntarily assumes an obligation to proceed under certain state laws, traditional preemption doctrine does not apply to shield a party from liability for breach of that agreement." *Id.* at 326-27 (citing *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 229 (1995)); *see also Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 526 n.24 (1992) ("[C]ommon understanding dictates that a contractual require-ment, although only enforceable under state law, is not 'imposed' by the State, but rather is 'imposed' by the con-tracting party upon itself"). *Epps* warned, however, that under Maryland law, "when a contractual term incorporating state or federal law is not 'the product of a negotiation yielding a freely-entered contract,' it will not be enforced." 675 F.3d at 327 (quoting *Wells Fargo Home Mortg., Inc. v. Neal*, 922 A.2d 538, 546 (Md. 2007)).

The inquiry, then, turns on whether the CLEC clause in Decohen's RIC was freely chosen by the parties. The contract stated that it "shall be subject to the Credit Grantor Closed End Credit Provisions (Subtitle 10) of Title 12 of the Com-mercial Law Article of the Maryland Code." J.A. 45. We have held the election of the CLEC in a contract is voluntary. *See Epps*, 675 F.3d at 328 (noting that a car dealer can choose to have a RIC governed by either the CLEC or the Maryland Retail Installment Sales Act, Md. Code Ann., Com. Law § 12-601 *et seq.*). We stated in *Epps* that when the originating lender chooses to adopt the CLEC when it could have made a different choice, the assignee "is bound by that choice." *Id.*

For the breach of contract claim, the facts of this case are indistinguishable from the facts in *Epps*, in which a local car dealer originated a RIC in which the parties elected to be gov-erned by the CLEC, and then assigned the RIC to a national bank, Chase. *Id.* at 318. We held the assignment did not allow Chase to escape its obligations under a voluntarily chosen contract term. We stated:

> Chase has purchased a RIC that elects the CLEC, sought higher late fees from Epps (as authorized by

the CLEC), and, upon breaching the RIC by failing to abide by its repossession notice requirements, claimed that the election of the CLEC was foisted upon it. . . . Chase may not take advantage of favorable, voluntary, contract terms, and then cry foul when it fails to adhere to its own contractually derived obligations.

*Id.* at 328. We reach the same conclusion here: Capital One may not purchase a RIC that elects the CLEC, accept payments on a principal amount that includes a $600 fee for a debt cancellation agreement governed by the CLEC, and then refuse to abide by the terms of the CLEC when it is no longer convenient to do so. The RIC signed by Decohen and Nation Auto voluntarily elected to be governed by the CLEC. The assignment of the loan by Nation Auto to Capital One does not allow Capital One to escape the obligations Nation Auto voluntarily undertook.

Other courts have come to similar conclusions. In *Thomas v. U.S. Bank, N.A.*, 575 F.3d 794, 796 (8th Cir. 2009), a California lending institution assigned mortgages in Missouri to various national banks. The national banks argued they were not subject to the Missouri Second Mortgage Loans Act because the NBA preempted any claims against them under state law, regardless of whether the national banks originated the loans or purchased the loans as assignees. *Id.* at 797. The Eighth Circuit held the assignment did not absolve the national banks of state law claims:

The national banks did not originate the loans at issue, but rather are assignee banks who subsequently purchased the loans. As assignees, they are subject to all the claims which could have been brought against the originator of the loan. To hold otherwise would allow an originating bank to cleanse an otherwise illegal loan merely by assigning it to a national bank.

*Id.* at 800-01 (citation omitted). Analogously, in *Aguayo*, 653 F.3d at 915, the Ninth Circuit stated that when a car dealership signs a RIC with a consumer and assigns that RIC to a national bank, the bank "assume[s] the contract terms as an assignee." The court thus held that the California Rees-Levering Act, enacted to protect motor vehicle purchasers, applied to "any defaulted car loan repossession, irrespective of who made the initial car loan, whether it was a local lender such as the dealership, a California state lender, or a national bank." *Id.* at 924.

Finally, the reference to the CLEC in the RIC signed by Decohen and Nation Auto is sufficient to incorporate the terms of the CLEC into the contract. "Maryland law recognizes that parties may agree to define their rights and obligations by reference to documents or rules external to the contract." *Wells v. Chevy Chase Bank, F.S.B.*, 832 A.2d 812, 831 (Md. 2003). The district court erred in reasoning that "nothing in the complaints, Credit Contract, or GAP Agreement shows that Capital One agreed, or was otherwise required, to cancel Decohen's remaining loan balance." *Decohen*, 2011 WL 3438625, at *5. The credit contract, or RIC, plainly stated that it "shall be subject to the [CLEC]." J.A. 45. The CLEC states that the credit grantor must cancel "the remaining loan balance in the event of theft or total destruction." Md. Code Ann., Com. Law § 12-1001(h). The district court similarly erred when it stated that "no provision in the CLEC mandates that creditors cancel a remaining loan balance in the event of a total loss." *Decohen*, 2011 WL 3438625, at *5. The provision that does so is § 12-1001(h). Decohen's credit contract, in which the parties elected to be governed by the CLEC, thus incorporated the terms of the CLEC to govern the attached debt cancellation agreement. Absent some contrary evidentiary showing, Capital One's refusal to cancel Decohen's "remaining loan balance" would constitute a breach of that contract. In any event, a breach of contract claim demonstrably has been adequately pleaded.

Accordingly, the district court erred in dismissing Decohen's breach of contract claim.

## III.

For the foregoing reasons, we vacate the judgment of the district court with regard to Decohen's CLEC and breach of contract claims and remand for further proceedings consistent with this opinion.

*VACATED AND REMANDED*