# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 2, 2013

No. 13-60686
c/w No. 13-60687

Lyle W. Cayce
Clerk

JIM HOOD, Attorney General of the State of Mississippi, ex rel. The State of Mississippi; STATE OF MISSISSIPPI,

Plaintiffs - Appellants

v.

JP MORGAN CHASE & COMPANY; CHASE BANK USA, N.A,

Defendants - Appellees

_____

JIM HOOD, Attorney General of the State of Mississippi, ex rel.  The State of Mississippi,

Plaintiff - Appellant

v.

HSBC BANK NEVADA, N.A.; HSBC CARD SERVICES, INCORPORATED; HSBC BANK USA, INCORPORATED,

Defendants - Appellees

_____

JIM HOOD, Attorney General of the State of Mississippi, ex rel.  The State of Mississippi; THE STATE OF MISSISSIPPI,

Plaintiffs - Appellants

v.

No. 13-60686
c/w No. 13-60687

CITIGROUP, INCORPORATED; CITIBANK, N.A.; DEPARTMENT STORES NATIONAL BANK,

Defendants - Appellees

_____

JIM HOOD, Attorney General of the State of Mississippi, ex rel.  The State of Mississippi,

Plaintiff - Appellant

v.

DISCOVER FINANCIAL SERVICES, INCORPORATED; DISCOVER BANK; DFS SERVICES, L.L.C.; AMERICAN BANKERS MANAGEMENT COMPANY, INCORPORATED,

Defendants - Appellees

_____

JIM HOOD, Attorney General of the State of Mississippi, ex rel.  The State of Mississippi,

Plaintiff - Appellant

v.

BANK OF AMERICA CORPORATION; FIA CARD SERVICES, N.A.,

Defendants - Appellees

_____

JIM HOOD, Attorney General of the State of Mississippi, ex rel.  The State of Mississippi,

Plaintiff - Appellant

v.

CAPITAL ONE BANK USA, N.A.; CAPITAL ONE SERVICES, L.L.C.,

Defendants - Appellees

2

No. 13-60686
c/w No. 13-60687

---

Appeals from the United States District Court
for the Southern District of Mississippi

---

Before OWEN, ELROD, and HAYNES, Circuit Judges.

PER CURIAM:

The Attorney General of Mississippi (the "State") filed six in *parens patriae* complaints in the Mississippi Chancery Court alleging six credit card companies ("Defendants") violated the Mississippi Consumer Protection Act ("MCPA") by charging consumers for products they did not want or need. Defendants removed, arguing that there is federal subject matter jurisdiction both because this is a Class Action Fairness Act of 2005 ("CAFA") mass action and because the State's MCPA claims were preempted by the federal National Banking Act ("NBA"). The district court agreed, and denied the State's motions to remand. The State then filed two interlocutory appeals, one under CAFA's appeal provision, 28 U.S.C. § 1453(c), and another under 28 U.S.C. § 1292(b) to review two questions certified by the district court on the preemption issue. We granted both appeals in this consolidated case. We conclude that neither CAFA nor complete preemption by the NBA provides the basis for subject matter jurisdiction, and accordingly REVERSE and REMAND.

## I. BACKGROUND

In June 2012, the State filed six complaints in the Mississippi Chancery Court alleging Defendants violated the MCPA. Miss. Code Ann. § 75-24-1. The complaints allege that Defendants are "commit[ting] unfair and deceptive business practices" in violation of the MCPA by "marketing, selling, and administering" ancillary products to "unwitting" Mississippi credit card holders. These ancillary products include fee-based services to protect customers against

3

No. 13-60686
c/w No. 13-60687

unauthorized charges and identity theft, as well as products that suspend payment obligations under certain circumstances. The State alleges that Defendants sign up customers for these services without their knowledge or consent. The State also alleges that Defendants engage in a number of deceptive marketing practices, fail to make proper disclosures to their customers regarding the products, and enroll customers who are not eligible to receive the benefits of the services. The State seeks three forms of relief for these alleged violations: (1) an injunction preventing Defendants from engaging in these practices, (2) civil penalties for each violation of the MCPA, and (3) the disgorgement and restitution of any money Defendants made by these practices.

Only one of these services is at issue here: the Payment Protection Plan. A Payment Protection Plan is an amendment to the credit card loan agreement that suspends or cancels a customer's obligation to repay credit card debt under certain circumstances—such as death, disaster, disability, unemployment, marriage, divorce, or hospitalization—without adverse consequences to the customer. If the repayment obligation is suspended, the customer does not have to make minimum payments, and is relieved of interest charges and late fees during the relevant time period. If the repayment obligation is cancelled, the customer is also relieved of his or her obligation to pay some or all of the loan principal. These Plans are governed by federal regulations promulgated by the Office of Comptroller of the Currency ("OCC") under the NBA. 12 C.F.R. Part 37. The charges for the Plans are ordinarily calculated as a percentage of the customer's outstanding card balance and customers pay a separate fee for these services each month. The complaints estimate that annual charges for these optional services range between approximately $68.40 to $162.00 per customer. None of the complaints challenges the interest rates that the Defendants charge, and the State does not assert that Defendants exceed the legal rate of interest.

No. 13-60686
c/w No. 13-60687

Customers may receive a loan, in the form of a credit card, even if they elect not to enroll in the Payment Protection Plan. Customers continue to receive credit even if they later decide to cancel their Payment Protection Plan.

The State specifically disclaimed that there was federal question subject matter jurisdiction over any of the six actions:

> Nowhere herein does the State plead, expressly or implicitly, any cause of action or request any remedy that arises under or is founded upon federal law, nor does it bring this action on behalf of a class or any group of persons that can be construed as a class. The State specifically disclaims any such claims that would support removal of this action to a United States District Court on the basis of diversity or jurisdictional mandates under the Class Action Fairness Act of 2005 (28 U.S.C. §§ 1332(d), 1453, 171 1-171 5). If this Complaint is alleged to be a "mass action" pursuant to 28 U.S.C. § 1332, which the State denies, federal jurisdiction does not exist because the amount in controversy for any individual Mississippi consumer is less than $75,000, exclusive of interests and costs. . . . The State expressly avers that the only causes of action claimed, and the only remedies sought herein, are founded upon the statutory, common, and decisional laws of the State of Mississippi.

Instead of bringing a CAFA mass action, the State pleaded that it was "bring[ing] this action in its sovereign and quasi-sovereign capacity on behalf of the State to protect citizen consumers of Mississippi."

Defendants removed the six cases to the United State District Court for the Southern District of Mississippi, arguing that there was federal jurisdiction because each case was a class action, a mass action, or both under CAFA ("CAFA grounds"). Defendants further asserted that the state law claims were either completely preempted by federal usury laws, or raised a substantial federal question that must be resolved in accordance with those laws ("preemption grounds"). In support of removal, Defendants filed declarations explaining that the Payment Protection Plans are optional amendments to credit card holder agreements that modify the contractual terms for repayment by suspending or

canceling a credit card holder's obligations in whole or in part under certain circumstances. The declarations also state that Payment Protection Plans extend additional credit by relieving customers of (1) minimum payment obligations, thus extending the terms of the loans, (2) the prospect of breaching or defaulting, and (3) some or all of their loan balances. The Plans also allow customers to retain loaned funds on more favorable terms, and to continue to draw credit where they might otherwise not be able to do so. The declarations further assert that thousands of Mississippi residents have paid Payment Protection Plan fees, and that these fees exceed $5,000,000 in the aggregate. The declarations are silent as to fees charged to any individual customers, and do not allege that any customer has paid $75,000 or more in such fees. The declarations are also silent as to the balances owed by any of the customers, and do not assert that any individual balances meet or exceed $75,000.

The State filed motions to remand each case to state court. The district court consolidated the cases and stayed the case pending our decision in *Mississippi ex rel. Hood v. AU Optronics Corp.*, 701 F.3d 796 (5th Cir. 2012), *cert. granted*, 133 S. Ct. 2736 (2013), after which the district court set a new briefing schedule. Relying on both CAFA and preemption grounds, the district court denied all six of the State's motions to remand in a single order ("Order"). The district court determined that it had subject matter jurisdiction because (1) the cases were mass actions under CAFA, (2) the NBA, 12 U.S.C. §§ 85–86, and Depository Institutions Deregulation and Monetary Control Act ("DIDA"), 12 U.S.C. § 1831(d), preempted some of the state law claims asserted by the State, and (3) it had supplemental jurisdiction to hear the other state claims.[1]

---

[1] The district court determined that the NBA preempted claims against Defendants Chase, HSBC, Citigroup, Bank of America, and Capital One. Because Defendant Discover is a state-chartered bank, the district court found that the NBA did not apply to the State's action against Discover. Instead, it determined that State's claims were preempted by DIDA.

No. 13-60686
c/w No. 13-60687

Based on Defendants' declarations, the district court found that the Payment Protection Plans were intended to modify the contractual terms for prepayment of an outstanding credit card balance and the fees Defendants charged for those Plans were therefore interest because they compensate Defendants for an extension of credit. The district court then determined "that the State has challenged the rate of the fees being charged for Payment Protection Plans, and has impliedly alleged that those fees are excessive in light of the benefits being derived by the credit card holders who have been enrolled in such plans." The district court concluded that federal usury law therefore preempted the State's state law claims.

The State then petitioned this court for permission to file an interlocutory appeal of the Order, which we granted.[2] Because the district court could properly deny remand if either CAFA or the NBA provides federal subject matter jurisdiction, we examine each in turn.

## II. STANDARD OF REVIEW

We review a district court's denial of a motion to remand for lack of subject matter jurisdiction *de novo*. *Mumfrey v. CVS Pharmacy, Inc.*, 719 F.3d 392, 397 (5th Cir. 2013) (citing *Allen v. R & H Oil & Gas Co.*, 63 F.3d 1326, 1336 (5th Cir.

---

Defendants assert, and the State does not contest, that the same preemption analysis applies for both the NBA and DIDA. We accordingly assess Discover's claims under our NBA analysis.

[2] The State filed two petitions for interlocutory appeal. First, the State sought permission to appeal under CAFA's interlocutory appeal provision, 28 U.S.C. § 1453(c). Although the State asserted that we have jurisdiction under 28 U.S.C. § 1453 to review both the CAFA and preemption grounds for denying remand, it also asked the district court to certify the preemption question. The district court did so on September 12, 2013, and has stayed the consolidating proceeding pending our decision regarding these two interlocutory appeals. The district court certified the following questions: (1) Do the Payment Protection Plans at issue in the subject lawsuits constitute "interest" as that term is defined by 12 C.F.R. § 7.4001(a)? (2) Has the State of Mississippi alleged that the rate being charged for the Payment Protection Plans was excessive, and therefore usurious, for the purpose of implicating preemption under the NBA?

7

1995)).  Any ambiguities are construed against removal and in favor of remand to state court.  *Id.*  (citing *Manguno v. Prudential Prop. & Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002)).  "The right of removal is entirely a creature of statute and a suit commenced in a state court must remain there until cause is shown for its transfer under some act of Congress.  These statutory procedures for removal are to be strictly construed."  *Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 32 (2002)  (internal quotations and citations omitted).  "It is to be presumed that a cause lies outside this limited [federal] jurisdiction and the burden of establishing the contrary rests upon the party asserting jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (internal citations omitted); *see also Mumfrey*, 719 F.3d at 397 (citing *Acuna v. Brown & Root, Inc.*, 200 F.3d 335, 339 (5th Cir. 2000)).  This is especially true where, as here, the State brings a case in the courts of its own state.  *See Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 21 n.22 (1983) ("[C]onsiderations of comity make us reluctant to snatch cases which a State has brought from the courts of that State, unless some clear rule demands it.").

### III. CAFA

CAFA provides federal jurisdiction over a "mass action," which is defined as

> any civil action . . . in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact, except that jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under subsection (a).

28 U.S.C. § 1332(d)(11)(B)(i); *see also AU Optronics*, 701 F.3d at 798–99.  Subsection (a) states that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs . . . ."  28 U.S.C. § 1332(a).  The case must

also have an aggregate amount in controversy of at least $5,000,000. *Louisiana ex rel. Caldwell v. Allstate Ins. Co.*, 536 F.3d 418, 430 (5th Cir. 2008). In order to distinguish between CAFA's two amounts in controversy, we refer to the $5,000,000 requirement as the "aggregate amount in controversy" and the $75,000 requirement from § 1332(a) as the "individual amount in controversy."

As the party seeking removal, Defendants bear the burden of proving both amounts in controversy. *See Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676, 686 (9th Cir. 2006). In *Abrego*, one thousand one hundred and sixty Panamanian banana plantation workers filed a case in state court against the defendant. *Id.* at 678. The defendant removed, and the plaintiffs sought a remand to state court in an interlocutory appeal. There, as here, the parties raised arguments about who should bear the burden of proof for the individual amount in controversy requirement. The Ninth Circuit began by examining the plaintiffs' complaint, which did not seek a specific amount of damages, although they did plead that the amount in controversy exceeded $25,000. The defendant asserted in its notice of removal that "[g]iven the nature of the injuries claimed by Plaintiffs and the request for punitive damages," a review of plaintiffs' complaint indicated that both the aggregate and individual amount in controversy requirements were satisfied. *Id.* at 689. The Ninth Circuit nonetheless held that the defendant had not met its burden because it had not set forth any "underlying facts" to support this assertion. *Id.* The Ninth Circuit thus concluded that the removing defendant failed to prove that any of the plaintiffs satisfied CAFA's individual amount in controversy requirement. *Id.* at 686. The Ninth Circuit emphasized the strong presumption against removal, and explained that remand was appropriate because there was no subject matter

No. 13-60686
c/w No. 13-60687

jurisdiction. *Id.* at 690–91.[3]

Likewise, Defendants have not met their burden to prove that the individual amount in controversy requirement is satisfied here. The plain language of § 1332(d)(11)(B)(i) requires "plaintiffs" to satisfy the individual amount in controversy requirement. Given this explicit statutory language, it naturally follows that at least one plaintiff must satisfy the individual amount in controversy requirement in order for the district court to adjudicate a case or controversy. Defendants have failed to prove that even a single plaintiff here satisfies this requirement, and we therefore need not consider whether at least 100 plaintiffs must each satisfy the $75,000 jurisdictional amount in controversy requirement in § 1332(a).[4]

---

[3] Defendants cite our decision in *Preston v. Tenet Healthsystem Mem'l. Med. Ctr.*, and argue that the State should bear the burden of proof for the individual amount in controversy. 485 F.3d 793 (5th Cir. 2007). *Preston* is inapplicable here as it dealt with the burden of proving an exception to jurisdiction under § 1332(d)(4). In contrast, the question here involves the amount in controversy found in § 1332(a). As we have consistently held, the party seeking removal bears the burden of proving § 1332(a). *See, e.g.*, *Manguno*, 276 F.3d at 723.

[4] Our court has not yet addressed whether at least 100, or only one of the plaintiffs must satisfy the individual amount in controversy requirement in order to confer CAFA jurisdiction. Other courts that have confronted this question have largely avoided determining how many plaintiffs must satisfy the individual amount in controversy requirement. *See Lowery v. Alabama Power Co.*, 483 F.3d 1184, 1203–04 (11th Cir. 2007) ("Because we hold in part VI, *infra*, that the defendants have not established the $5,000,000 aggregate amount in controversy, we need not decide today whether the $75,000 provision might yet create an additional threshold requirement that the party bearing the burden of establishing the court's jurisdiction must establish at the outset, i.e., that the claims of at least one of the plaintiffs exceed $75,000."); *Abrego*, 443 F.3d at 689 ("Dow, however, has not established that even one plaintiff satisfies the $75,000 jurisdictional amount requirement of § 1332(a), applicable to mass actions by virtue of § 1332(d)(11)(B)(i)."); *Mississippi ex rel. Hood v. Entergy Mississippi, Inc.*, 3:08-CV7-80 HTW-LRA, 2012 WL 3704935, at *13 (S.D. Miss. Aug. 25, 2012) ("This court finds that whether the $75,000 amount in controversy requirement per claim is a jurisdictional requirement or an exception which excludes specific plaintiffs' claims from CAFA jurisdiction is immaterial here. Entergy has provided sufficient evidence that numerous plaintiffs, if considered real parties in interest, have damages claims for at least $75,000."); *Armstead v. Multi-Chem Group, LLC*, No. 6:11-2136, 2012 U.S. Dist. LEXIS 71543, at *36 (W.D. La. May 21, 2012) ("[D]efendants have failed to satisfy their burden of proof demonstrating that any single plaintiff's claim exceeds this court's $75,000.00 jurisdictional minimum. As was the

No. 13-60686
c/w No. 13-60687

In order to determine whether any plaintiff satisfies the individual amount in controversy requirement, we first address who the possible plaintiffs are in this action. Based on our decisions in *Caldwell*, 536 F.3d at 430, and *AU Optronics*, 701 F.3d at 798–800, Defendants argue that the individual customers who paid for these ancillary services are the real parties in interest for the State's restitution claims. Assuming *arguendo* that this is so, Defendants have not presented evidence to show that any of these customers satisfies the individual amount in controversy requirement.[5] For each customer, the amount in controversy equates to the amount that the particular customer has paid in fees for Defendants' ancillary services.[6] *See Garcia v. Koch Oil Co. of Tex., Inc.*,

case in *Abrego*, regardless of whether removal under CAFA was proper based on the $5,000,000 aggregate amount in controversy, the case cannot go forward unless there is at least one plaintiff whose claims can remain in federal court." (internal quotations and citations omitted)). As none of the plaintiffs here satisfies this requirement, we need not resolve the issue of whether more than one plaintiff must satisfy the individual amount in controversy requirement today.

[5] We recognize that the Supreme Court is currently reviewing our decision in *AU Optronics*, and may determine that the customers are not properly viewed as the real parties in interest for CAFA. Because we find that jurisdiction is lacking here regardless of whether the customers are considered real parties in interest, a decision by the Supreme Court contrary to the one that we reached in *AU Optronics* on that issue would not impact our result here.

[6] Defendants assert that the State also seeks cancellation of customers' entire credit card balances, which would place more than $75,000 in controversy for certain consumers. This argument mischaracterizes the State's claims. Nowhere in the complaints does the State seek cancellation or disgorgement of the customers' entire credit card balances. Instead, the State seeks civil penalties and "monies acquired by Defendants by means of any practice prohibited by the CPA." The customers' credit card balances are loans from Defendants, not "monies" Defendants acquired through violating the MCPA. We therefore agree with the State that it is only requesting restitution for the *fees* that Defendants acquired through thier various practices, rather than the credit card balances. Moreover, even assuming *arguendo* that the State is seeking cancellation of these balances, there is nothing in the record indicating that any customer's credit card balance exceeds $75,000. Indeed, Defendants' own declarations are silent as to the amounts of these balances. As Defendants do not present any evidence regarding the amounts that these customers owe, they have not established that any of these credit card balances would satisfy the individual amount in controversy requirement.

11

351 F.3d 636, 640 (5th Cir. 2003) (explaining that "the amount in controversy is measured by the value of the object of the litigation") (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977)).

The State expressly denies representing individual customers, and asserts that it does not know how much these individual credit card holders have paid in fees. The State asserts in its complaints that none of the individual customers satisfies the individual amount in controversy requirement because, the State contends, the annual fees for each consumer average between $68.40 to $162.00.[7] Based on the State's contentions, it would take an individual customer hundreds of years to reach the individual amount in controversy requirement. Although Defendants filed declarations asserting that CAFA's aggregate amount in controversy was met, they did not make any similar statements regarding whether any individual credit card holders satisfy the individual amount in controversy requirement. We find this omission telling, given that Defendants have ready access to information regarding their own customers and could easily assert that just one of those customers satisfies this requirement. Instead, Defendants ask us to require the State to prove a negative, based on evidence outside of the State's control, about unknown parties that it expressly denies representing. We decline to do so. Defendants have failed to provide any evidence indicating that any of the credit card holders satisfies the individual amount in controversy, and have thus failed to meet their burden to prove this requirement.

Likewise, the State is not a mass action plaintiff that satisfies the individual amount in controversy requirement. Defendants argue that in

---

[7] The fees are charged as a percentage of the customer's monthly credit card charges. The State alleges that these fees are around 0.9%, and bases its annual estimates on a customer who charges $1,000 per month to the card.

addition to bringing claims on behalf of Mississippi consumers, the State also brought claims for restitution and civil penalties on its own behalf. Defendants assert that these claims where the State itself is the real party in interest exceed the individual amount in controversy requirement and that, as a result, there is at least one plaintiff that satisfies this requirement. We disagree.

First, the State does not allege that it, or any of its employees, had credit card accounts for which it paid Defendants for any of the ancillary services. Thus, any claims that the State has against Defendants could only be based on the fees paid by the individual customers. Second, under our precedent the State is not the real party in interest with respect to this claim for restitution. In *Caldwell*, the State of Louisiana filed a *parens patriae* action against a number of insurance companies alleging violations of the Louisiana Monopolies Act. 536 F.3d at 421–22. We held that the case was properly removed under CAFA because the state was asserting claims related to the interests of "citizen policyholders," rather than its own sovereign interests. *Id.* at 424–27, 430. We concluded that the 100 or more Louisiana citizens—rather than the state—were the plaintiffs for those claims. *Id.* at 430. Here, the State likewise asserts a restitution claim on behalf of the credit card holders who paid the contested fees. Under *Caldwell*, the real parties in interest are therefore these customers, rather than the State.

Even assuming that one could liberally construe the restitution claims as belonging to the State itself, it is still not a mass action plaintiff that could support subject matter jurisdiction. Any claims for which the State is the sole party in interest could not possibly be mass action claims, as they are brought by a *single* plaintiff on its own behalf, rather than a *mass* of plaintiffs.[8] As a

---

[8] As we have previously held, the State is entitled to sever and remand any claims for which it is the real party in interest. In *Caldwell* we held that jurisdiction was present based

No. 13-60686
c/w No. 13-60687

result, neither the civil penalties nor the restitution claim provides the individual amount in controversy requirement necessary for a CAFA mass action.[9]

In sum, we agree with the reasoning of our sister circuit in *Abrego*, and accordingly hold that there is no jurisdiction under CAFA where, as here, Defendants have failed to put forth evidence that any plaintiff satisfies the individual amount in controversy requirement.

## IV. PREEMPTION

We now turn to whether the State's MCPA claims are preempted by federal law, and conclude that they are not. "A plaintiff is the master of his

---

on our determination that the claims for damages were *not* brought on behalf of the state. 536 F.3d at 429–31. We then explained that "Louisiana is also seeking the remedy of injunctive relief. If Louisiana were only seeking that remedy, which is clearly on behalf of the State, its argument that it is the only real party in interest would be much more compelling." *Id.* at 430. As a result, we left open on remand the possibility for the district court to sever those claims and remand them back to state court. *Id.* Here, the State requested that all claims in which the State is indisputably the real party in interest be severed and remanded to state court. Such severance would be consistent with our holding in *Caldwell*, where we instructed the district court to consider severing and remanding claims "clearly [brought] on behalf of the State." *Id.* As the district court here correctly determined, the State is also the sole real party in interest with respect to the civil penalties because those claims can only be brought by the State through its Attorney General. *See* Miss. Code Ann. § 75-24-9; § 75-24-19(1)(b). These claims cannot support subject matter jurisdiction under CAFA.

[9] Defendants also argue that the district court could exercise supplemental jurisdiction over the individual customers who do not satisfy the individual amount in controversy requirement. We disagree. First, supplemental jurisdiction is possible only "where the other elements of jurisdiction are present and at least one named plaintiff in the action satisfies the amount-in-controversy requirement." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 549 (2005). Because we hold that *none* of the plaintiffs satisfy the individual amount in controversy requirement, the district court could not exercise supplemental jurisdiction "over the claims of other plaintiffs in the same Article III case or controversy, even if those claims are for less than the jurisdictional amount specified in the statute setting forth the requirements for diversity jurisdiction." *Id.* Even assuming *arguendo* that one of the plaintiffs did satisfy the individual amount in controversy requirement, the exercise of supplemental jurisdiction here would be an end-run around CAFA, which contains the explicit statutory requirement that "jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy" the $75,000 requirement. 28 U.S.C. § 1332(d)(11)(B)(i).

14

complaint and may allege only state law causes of action, even when federal remedies might also exist." *Elam v. Kansas City S. Ry. Co.*, 635 F.3d 796, 803 (5th Cir. 2011). "[A] *defendant* cannot, merely by injecting a federal question into an action that asserts what is plainly a state-law claim, transform the action into one arising under federal law, thereby selecting the forum in which the claim shall be litigated." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 399 (1987).

> An exception to the well-pleaded complaint rule arises when Congress so completely preempt[s] a particular area that any civil complaint raising this select group of claims is necessarily federal in character. . . . The question in complete preemption analysis is whether Congress intended the federal cause of action to be the exclusive cause of action for the particular claims asserted under state law. . . . [C]omplete preemption is a narrow exception to the well-pleaded complaint rule.

*Elam*, 635 F.3d at 803 (internal quotations and citations omitted). Thus, the State's claims are preempted only if federal law provides the "exclusive cause of action" for its claims. *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 11 (2003).

Statutes that authorize removal, including those that do so through complete preemption, are meant to be strictly construed. *See Syngenta*, 537 U.S. at 32; *see also Healy v. Ratta*, 292 U.S. 263, 270 (1934) ("Due regard for the rightful independence of state governments . . . requires that [federal courts] scrupulously confine their own jurisdiction to the precise limits which the statute has defined."). In addition, "considerations of comity make us reluctant to snatch cases which a State has brought from the courts of that State, unless some clear rule demands it." *See Franchise Tax Bd.*, 463 U.S. at 21 n.22. Preemption is unwarranted here because Defendants fail to identify a clear rule that demands removal under the applicable Supreme Court precedent, statute, or regulations.

15

No. 13-60686
c/w No. 13-60687

A.

Defendants argue that the State's claims are completely preempted based on the Supreme Court's decision in *Beneficial National*, 539 U.S. at 11. *Beneficial National* held that state law usury claims against nationally chartered banks are completely preempted by §§ 85–86 of the NBA. *Id.* at 9–11. Usury claims involve allegations that the lender is charging too much in interest. *See id.* at 9; 44B Am. Jur. 2d, Interest and Usury § 81. The plaintiffs in *Beneficial National* "sought relief for usury violations and claimed that petitioners charged . . . excessive interest in violation" of state law and thus "expressly charged petitioners with usury." *Id.* at 9 (internal quotation marks omitted). The Supreme Court explained that §§ 85–86 of the NBA are designed to first "set[] forth the substantive limits on the rates of interest that national banks may charge" and then "set[] forth the elements of a usury claim against a national bank." *Id.*[10]  The Supreme Court concluded that these sections therefore provide the exclusive cause of action for such claims against national banks, and thus preempt any state law usury claims. *Id.* at 11.

*Beneficial National* did not hold that the NBA preempts all state regulation of national banks. Instead, the holding was limited to state law usury claims. Indeed, the Supreme Court specifically framed "the dispositive question" in that case as "[d]oes the National Bank Act provide the exclusive cause of action for usury claims against national banks?" *Id.* at 9. Since its decision in *Beneficial National*, the Supreme Court has "made clear that federal control shields national banking from unduly burdensome and duplicative state regulation." *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007). Although

---

[10] Section 85 specifies the amount of interest that nationally chartered banks may charge, and § 86 addresses "[t]he taking, receiving, reserving, or charging a rate of interest greater than is allowed by section 85 of this title, when knowingly done, shall be deemed a forfeiture of the entire interest . . . ."). 12 U.S.C. §§ 85–86.

16

this federal control limits the ways in which state law can regulate national banks, it is not meant to be a blanket ban on any state law that might impact a national bank. As the Supreme Court explained in *Watters*,

> [f]ederally chartered banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA. For example, state usury laws govern the maximum rate of interest national banks can charge on loans . . . . However, the States can exercise no control over [national banks], nor in any wise affect their operation, except in so far as Congress may see proper to permit. Any thing beyond this is an abuse, because it is the usurpation of power which a single State cannot give.

*Id.* at 11 (internal citations and quotation marks omitted).

Defendants argue, and the district court agreed, that the fees associated with the Payment Protection Plans were "interest," and that by challenging Defendants' practices in charging these fees, the State was implicitly alleging usury claims. The first question, then, is whether the Defendants have established that the fees associated with these Plans are "interest."

B.

Neither the NBA nor the regulations promulgated by the OCC explicitly indicate that the Payment Protection Plan fees are "interest." The NBA does not define the term. The OCC's regulations define "interest" to include

> any payment compensating a creditor or prospective creditor for an extension of credit, making available of a line of credit, or any default or breach by a borrower of a condition upon which credit was extended. It includes, among other things, the following fees connected with credit extension or availability: numerical periodic rates, late fees, creditor-imposed not sufficient funds (NSF) fees charged when a borrower tenders payment on a debt with a check drawn on insufficient funds, overlimit fees, annual fees, cash advance fees, and membership fees. It does not ordinarily include appraisal fees, premiums and commissions attributable to insurance guaranteeing repayment of any extension of credit, finders' fees, fees for document preparation or notarization, or fees incurred to obtain

No. 13-60686
c/w No. 13-60687

credit reports.

12 C.F.R. § 7.4001(a).  In *Smiley v. Citibank (S.D.), N.A*, the Supreme Court deferred to this definition of interest.  517 U.S. 735, 741–42 (1996).  In doing so, the Supreme Court recognized that not all fees associated with loans are interest.  *Id*.  As the Supreme Court explained,

> [t]o be sure, in the broadest sense *all* payments connected in any way with the loan including reimbursement of the lender's costs in processing the application, insuring the loan, and appraising the collateral can be regarded as compensating [the] creditor for [the] extension of credit.  But it seems to us quite possible and rational to distinguish, as the regulation does, between those charges that are *specifically assigned* to such expenses and those that are assessed for simply making the loan, or for the borrower's default.

*Id.* (internal quotation marks omitted).  Section 7.4001(a) draws a line "between (1) 'payment compensating a creditor or prospective creditor for an extension of credit, making available of a line of credit, or any default or breach by a borrower of a condition upon which credit was extended,' and (2) all other payments."  *Id.* at 741; *see also Phipps v. F.D.I.C.*, 417 F.3d 1006, 1012 (8th Cir. 2005).[11]  Only

---

[11] Defendants make two arguments that the OCC defines Payment Protection Plans as interest, and suggests that this definition is controlling.  Both are unavailing.  First, Defendants argue that the Plans are "debt suspension agreements" or "debt cancellation contracts" within the meaning of OCC's regulations, and that an OCC interpretive letter defines these fees as compensation for the credit risk that it undertakes in making a loan.  This interpretive letter never takes a stance on whether or not these agreements constitute interest.  Instead, the letter merely explains that "providing debt suspension products in connection with a bank's credit card business is permissible for the Bank," because "[a] debt suspension product simply interrupts the obligation to pay for a specified time, rather than cancels it.  From the bank's perspective, a debt suspension product provides a mechanism for the bank to manage and obtain compensation for the credit risk that it undertakes in making a loan.  Thus, it is a very logical outgrowth of the bank's express lending authority."  OCC Interp. Ltr. 903, 2000 WL 33128696, at *2, 3 (Dec. 28, 2000).  Moreover, even if the letter did take a position on whether these agreements are interest, such a decision would not be entitled to the same judicial deference as OCC's regulations.  In *Smiley*, the Court emphasized that it was deferring to the definition that the OCC promulgated in a regulation.  *Smiley*, 517 U.S. at 741–43.  Interpretive letters do not receive this same level of deference.  *See United States v. Mead Corp.*, 533 U.S. 218, 234 (2001) (explaining that "Customs ruling letters do not fall within *Chevron*" but "that an agency's interpretation may merit some deference whatever

18

No. 13-60686
c/w No. 13-60687

fees that fall into this first category are "interest" under the NBA.

The State provides several arguments for why the Payment Protection Plan fees fall outside of the § 7.4001(a)'s definition of interest. First, the State argues that these charges are best viewed as fees associated with providing a separate credit service, rather than fees for the extension of credit. Customers can receive the loan without signing up for the Protection Payment Plans, and may continue to use the line of credit even if they stop participating in the Plans. Customers pay a separate monthly fee in order to receive this service. Thus, the fees for the Payment Protection Plans can be viewed as charges specifically assigned to cover an ancillary service, rather than general charges for the extension of credit. *See West Virginia ex rel. McGraw v. JPMorgan Chase & Co.*, 842 F. Supp. 2d 984, 991–92 (S.D. W. Va. 2012). The State also argues these Plans are more akin to fees for insurance, which are exempted from the definition of interest, than to fees for the extension of credit. Like insurance, the Plans are meant to protect customers in the event that certain future situations arise by keeping open their lines of credit and suspending certain penalties attached to the loan. And like insurance, the Plans are supposed to benefit the borrower as well as the lender by providing credit protection under certain circumstances. In contrast, interest provides a benefit only to the lender.

Defendants point out that Payment Protection Plans modify the repayment terms of the loan agreements and are therefore "no less a part of lending than any of the various other terms . . . that are part of a loan agreement." As the Supreme Court has explained, however, "in the broadest

---

its form, given the specialized experience and broader investigations and information available to the agency" (internal quotation marks omitted)).

sense all payments connected in any way with the loan . . . can be regarded as compensating [the] creditor for [the] extension of credit." *Smiley*, 517 U.S. at 741–42. Likewise, in a broad sense all ancillary products or plans that affect the repayment terms of the loan can be seen as part of the loan agreement, but it does not necessarily follow that the fees associated with those products are interest. Here, Defendants bear a heavy burden of proving that removal is appropriate. *See Manguno*, 276 F.3d at 723 (noting that "[a]ny ambiguities are construed against removal because the removal statute should be strictly construed in favor of remand" (citation omitted)). At best, Defendants have only shown that the Payment Protection Plan fees could conceivably fit within the definition of "interest." Defendants have failed to show that a clear rule demands removal, and remand is therefore appropriate. *See Franchise Tax Bd.*, 463 U.S. at 21 n.22.

## C.

Even assuming *arguendo* that the fees associated with Payment Protection Plans were interest, the State's claims would not be preempted because the State never alleges that Defendants charged an improper rate for the Payment Protect Plans, and thus does not allege that Defendants charged too much in interest.[12]

None of the State's claims can be fairly construed as allegations that Defendants violated the NBA. The State never alleges that Defendants charge an interest rate greater than allowed by § 85. In fact, the State never makes any assertions about Defendants' rate of interest. Nowhere in the State's complaints is there any calculation of the total rate of interest that Defendants charge, or

---

[12] The State's claims fall into three basic categories: (1) claims for unfair marketing practices, (2) non-disclosure claims, and (3) claims that the ancillary services had little or no value for certain customers. Only this third category of claims can possibly be considered allegations that Defendants charged usurious rates. As a result, we review this third category.

any description of the legal rate of interest. While not dispositive, we find it telling that the complaints omit these vital elements of a usury claim, and do not reference or cite the portions of Mississippi law that address usury. Instead, the State complains of Defendants' unfair and deceptive practices. Indeed, the gravamen of the State's complaints is that the customers do not actually understand that they have agreed to purchase these services and are charged without their consent, not that they are being charged too much. Neither § 85 nor § 86 provides a cause of action for these kinds of consumer protection claims. *See Bernhard*, 523 F.3d at 553 ("[W]e must determine that Congress intended a federal act to provide the exclusive cause of action for the claims at issue to hold that it completely preempts state law claims." (citation omitted)).

Defendants argue that the State is alleging that the Payment Protection Plans have little value to certain customers, and in doing so is implicitly arguing that the fees are disproportionate to the value conferred on those customers. In essence, Defendants argue, this is a claim that Defendants overcharge customers for these services. We disagree. Although the two issues are linked, there is a difference between alleging that certain customers are being charged too much, and alleging that they should have never been charged for the service in the first place. The State makes only the latter claim, and when viewed in the context of the State's marketing and non-disclosure claims, it does not appear to challenge Defendants' fees as "usurious." The State is not alleging that Defendants should never be allowed to charge for Payment Protection Plans, or that the Plans' fees are themselves excessive; instead, the State takes issue with the fact that Defendants allegedly enroll certain customers in these Plans when the customers are not in a position to benefit from the Plans.[13]

---

[13] Even the district court recognized that the NBA does not preempt state consumer protection claims. Instead, the district court reasoned that the State was "impliedly" asserting

No. 13-60686
c/w No. 13-60687

Here, it is clear that when the State asserts in the complaints that the Plans have "little or no value," it is not alleging that the rate of interest that Defendants charge exceeds the interest rate established by statutory law. Instead, the allegation relates to Defendants' alleged practice of improperly enrolling certain unqualified customers in the Plans.[14]  A number of courts that have considered similar claims have likewise concluded that these are not usury allegations.  *See, e.g.*, *Losel v. Chase Bank USA, NA*, No. S-11-1999-KJM, 2012 WL 3778960, at *4 (E.D. Cal. Aug. 31, 2012) ("Moreover, plaintiff's use of the word 'high' to describe the interest rate does not automatically translate to a usury claim.  Read in context, the complaint's statements regarding the interest rate and late fees are contextual and merely inform the court of the consequences of Chase's alleged breach of implied covenant of good faith and fair dealing."); *McGraw*, 842 F. Supp. 2d at 993 ("Taken together, Plaintiff's claims do challenge the value of the plans to consumers, but in doing so plainly allege that the plans simply have no value to many consumers—not that they are usurious."); *Young v. Wells Fargo & Co.*, 671 F. Supp. 2d 1006, 1021 (S.D. Iowa

---

usury claims, and concluded that its claims were therefore preempted based on *Beneficial National*.  These "implicit" claims are a far cry from *Beneficial National*, where the complaint expressly "sought relief for 'usury violations' and claimed that petitioners 'charged . . . excessive interest in violation of the common law usury doctrine' and violated 'Alabama Code § 8-8-1, et seq. by charging excessive interest.'"  539 U.S. at 9, 11.  In contrast, the complaints here challenge a number of Defendants' practices with regard to a number of Defendants' products, but never allege that any of the fees are interest, or that the amount of those fees is excessive.  Rather than challenging how much the Defendants charge, the State takes issue with the Defendants' business practices.  Contrary to Defendants' argument, claims like these do not impede the federal government's ability to establish a uniform set of interest rates for nationally chartered banks.

[14] Defendants also argue that the State is alleging the interest rate is excessive by pleading that the Plans can trigger over-the-limit fees, which are themselves a form of interest.  But the State is not challenging the rate of Defendants' over-the-limit fees.  Rather, it is alleging that Defendants' practices unfairly trigger those fees.  This argument therefore fails for the same reasons stated above.

2009) ("Hence, the basis of the alleged excessiveness is that Wells Fargo charged fees when they should not, a wholly different claim from a claim that Wells Fargo applied an illegal interest rate."); *Saxton v. Capital One Bank*, 392 F. Supp. 2d 772, 783 (S.D. Miss. 2005) ("It is clear to the court that it is not the per se amount of late fees or other 'interest' that plaintiffs challenge here but rather the allegedly improper and deceptive manner in which it was charged. Hence, plaintiffs' complaint is not construable as a claim for usury."). Defendants have not met their burden of proving that the NBA provides the "exclusive cause of action" for the State's claims; thus, the claims are not preempted.

V.

In conclusion, neither CAFA nor federal preemption by the NBA provides a basis for federal subject matter jurisdiction in this case. To the extent that the district court has not yet ruled on whether substantial federal question jurisdiction exists, this case is remanded for the district court to make that determination.[15] If the district court has already ruled that there is no substantial federal question jurisdiction, or makes such a determination upon further review, then these cases should be remanded to the state court as there would be no federal jurisdiction, and thus nothing to support supplemental jurisdiction. We REVERSE and REMAND for proceedings consistent with this opinion.

---

[15] Defendants argue that the district court did not rule on this additional basis for removal. In reply, the State argues that the district court declined to find substantial federal question jurisdiction. We are unable to determine whether or not the district court has already reached this issue.